**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x
JOHN LEWIS, BARRY VAN RODEN,
ROBERT BROOKS, and JOHN FEILDERS,
on behalf of themselves and all those
persons similarly situated,

                Plaintiffs,        03 Civ. 4014 (LLS)

  v.                                  OPINION and ORDER

**HENRI A. TERMEER, GENZYME CORPORATION,**
**CONSTANTINE E. ANAGNOSTOPOULOS,**
**DOUGLAS BERTHIAUME, HENRY BLAIR,**
**ROBERT CARPENTER, CHARLES COONEY,**
**VICTOR DZAU, CONNIE MACK III, and**
**MICHAEL S. WYZGA,**

                Defendants.
------------------------------------x

In this class action alleging violations of federal law, state law, and SEC Rule 10b-5, defendants[1] move to dismiss the fourth amended complaint ("FAC") pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the motion is granted in part and denied in part.

BACKGROUND

The lead plaintiffs bring this action on behalf of the purported class of shareholders who held Genzyme Biosurgery

---

[1] The defendants are Constantine E. Anagnostopoulos, Douglas Berthiaume, Henry Blair, Robert Carpenter, Charles Cooney, Victor Dzau, and Connie Mack III (at all relevant times members of the Board of Directors of Genzyme Corporation)(collectively, the "director defendants"), Henri A. Termeer (at all relevant times CEO, President and Chairman of the Board of Genzyme Corporation), Michael S. Wyzga (at all relevant times Chief Financial Officer and Senior Vice President of Genzyme Corporation), and Genzyme Corporation.

tracking stock ("GZBX Stock") on May 8, 2003 when Genzyme Corporation ("Genzyme") announced it would exchange all GZBX Stock for Genzyme General Stock ("GENZ Stock"). The following allegations are taken from the FAC and are accepted as true on this motion to dismiss. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

On December 19, 2000, Biomatrix Inc. merged into Genzyme. Internally, Genzyme merged Biomatrix's assets (which included Synvisc, a "blockbuster" medical product that was used to treat osteoarthritis) with those of its Surgical Products and Tissue Repair Division, creating Genzyme's Biosurgery Division. From the merger until June 30, 2003, Genzyme's corporate structure consisted of three distinct business divisions: the Genzyme General Division, the Biosurgery Division and the Molecular Oncology Division. In order to "track" the value and performance of each division, rather than the company as a whole, each division had its own tracking stock which was traded on the NASDAQ.[2]

The merger agreement included an Optional Exchange provision authorizing the Genzyme Board of Directors, "at any time," to declare the exchange of outstanding GZBX stock for

---

[2] Genzyme General traded under the symbol GENZ, Biosurgery traded under the symbol GZBX and Molecular Oncology traded under the symbol GZMO.

GENZ stock on an Exchange Date set by the Board.[3] February 10, 2006 Declaration of William I. Sussman, Ex. A, Genzyme Corporation's Joint Proxy Statement/Prospectus, F-3. Under this provision, an exchange would be made at the ratio of the price of Biosurgery shares (plus a 30% premium) to Genzyme General shares, based on the average closing prices of each during a prior 20 days' trading. These provisions were reflected in Genzyme's Restated Articles of Organization:

> The Board of Directors may at any time . . . declare that each of the outstanding shares of GBS Stock[4] shall be exchanged, on an Exchange Date, as determined by the Board of Directors, for (a) a number of fully paid and nonassessable shares of GGD Stock[5] (calculated to the nearest five decimal places) equal to (1) 130% of the Fair Market Value of one share of the GBS Stock (the "GBS Optional Exchange Amount") as of the date of the first public announcement by the Corporation (the "GBS Optional Exchange Announcement Date") of such exchange divided by (2) the Fair Market Value of one share of GGD Stock as of such GBS Optional Exchange Announcement Date.

February 10, 2006 Declaration of William I. Sussman, Ex. B, Restated Articles of Organization, Art. IV(E)(6)(a)(1). Fair Market Value was defined as:

> (1) as to shares of any series of stock of the Corporation as of any date, the average of the daily Closing Prices for the 20 consecutive Business Days commencing on the 30th Business Day prior to such date, except that in the event such Closing Prices are

---

[3] This provision also allowed the Board to exchange the GZBX shares for cash or a combination of cash and GENZ shares.
[4] GBS Stock is Genzyme Biosurgery Division Common Stock, traded under the symbol GZBX.
[5] GGD Stock is Genzyme General Division Common Stock, traded under the symbol GENZ.

>       unavailable, Fair Market Value shall be determined by
>       the Board of Directors.

Id. at Art. IV(F)(7)(f).

On May 8, 2003, Genzyme announced that the Board was exercising its rights under the Optional Exchange provision and exchanging all GZBX stock for GENZ stock on June 30, 2003 (the "Exchange"). The announcement retroactively set the pricing period for determining the Fair Market Value of GZBX and GENZ stocks as March 26, 2003 through April 23, 2003. On June 30, 2003, each share of GZBX stock was exchanged for .0491 shares of GENZ, a value of $1.77 per share of GZBX stock.[6]

Plaintiffs allege that defendants engaged in a fraudulent scheme aimed at implementing the Exchange at the most beneficial price to GENZ shareholders.[7] Because the terms of the Optional Exchange provision provided for the exchange rate to be based on the ratio of the Fair Market Values of GZBX and GENZ, the defendants sought to artificially depress the price of GZBX in relation to that of GENZ, and then timed the announcement of the Exchange to occur while the GZBX stock was depressed.

Defendants allegedly managed the Biosurgery Division's corporate earnings and withheld positive information about the

---

[6] The Exchange also called for all GZMO shareholders to exchange their stock for GENZ stock. After the Exchange, the tracking stock structure was terminated and a new security (also traded under the symbol GENZ) was created.
[7] Although the individual defendants owned both GZBX and GENZ stock, each one owned more GENZ than GZBX.

Biosurgery Division in an orchestrated effort to obscure the actual value and profitability of the Biosurgery Division and artificially depress the price of GZBX. In early 2003 GZBX announced poorer-than-expected sales for the fourth quarter of 2002 without fully disclosing the reasons for the decreased revenue. Defendants partially attributed the decreased sales to a draw down in inventory by one its major distributors, but did not disclose that defendants had urged the company to take the entire draw down during the fourth quarter, rather than spreading it over the second and third quarters as the parties had originally agreed. Defendants also failed to disclose that the Biosurgery Division had terminated its French distributor in order to distribute Synvisc directly in France beginning January 1, 2003, leading the distributor to reduce its inventory during the fourth quarter.

Plaintiffs allege that defendants also intentionally withheld the following positive information about the Biosurgery Division from the market in order to artificially depress the price of GZBX stock: (1) the planned sale of Biosurgery's cardiothoracic devices business, which was performing poorly and obscuring Biosurgery's positive results; (2) a new product development which would use Synvisc to modify osteoarthritis, rather than just relieving its symptoms; (3) internal valuations of the Biosurgery division which far exceeded the value

reflected by the Exchange; (4) two companies had expressed interest in purchasing Synvisc and were turned down because Genzyme would not sell Synvisc at any price; (5) positive news of Synvisc's 2003 first-quarter sales; and (6) the FDA had given conditional approval for a Synvisc hip trial. Following a pre-arranged time-line, the last two positive pieces of information were disclosed during a first-quarter "earnings call" (a public announcement by telephone conference, regarding anticipated financial results) scheduled for April 16, 2003. The Exchange announcement date was chosen so that the pricing period would expire on April 23, 2003, and thus limit the impact the positive news would have on the Exchange ratio.

The purpose and result of defendants' scheme was that the ratio at which the Exchange took place did not accurately reflect the value of the GZBX stock being exchanged.

## DISCUSSION

On a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted, a court must accept the factual allegations of the complaint as true, and draw all inferences in favor of the plaintiff. Mills, 12 F.3d 1170 at 1174. The court may consider exhibits annexed to the complaint or incorporated in it by reference. Brass v. American Film Technologies, Inc., 987 F.2d

142, 150 (2d Cir. 1993). The complaint may be dismissed only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

I.   Section 10(b) of the Exchange Act and Rule 10b-5

Claim one alleges violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5 makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

17 C.F.R. § 240.10b-5.

Plaintiffs allege that defendants engaged in a fraudulent scheme in violation of subdivisions (a) and (c) of Rule 10b-5. To state a claim under subdivisions (a) or (c), plaintiff must allege that the defendant "(1) committed a deceptive or manipulative act (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries." In re Parmalat Securities Litigation, 414 F.Supp.2d 428, 432 (S.D.N.Y. Feb. 9, 2006)(emphasis in original).

The causation element has two requirements: transaction causation and loss causation. Emergent Capital Inv. v. Stonepath Group, Inc., 343 F.3d 189, 196-97 (2d Cir. 2003). Transaction causation "refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities" and "is established simply by showing that, but for the claimed [misconduct], the plaintiff would not have entered into the detrimental securities transaction." Id. at 197 (internal citations omitted). "Loss causation, by contrast, is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Id.

Defendants maintain that the FAC does not plead transaction causation, arguing that plaintiffs were not misled into any investment decision because the Exchange was an involuntary

transaction requiring all GZBX shareholders to exchange their shares for GENZ stock. Plaintiffs contend that the Exchange, at the distorted price ratio, was the purpose of the scheme, and part of the defendants' misconduct.

The misconduct alleged here is precisely that which subdivisions (a) and (c) of Rule 10b-5 seek to redress. Defendants managed corporate earnings and systematically withheld positive information about the Biosurgery Division from the market with the express intention of artificially depressing the price of GZBX, to bias the ratio at which the stock would be exchanged. Once the GZBX price was sufficiently low, defendants set an announcement date which would limit the impact of favorable news issued during the pricing period. In the Exchange transaction, the ratio did not reflect the true value of the Biosurgery Division, and substantially underpaid the GZBX shareholders. This more than adequately asserts that the Exchange transaction was caused by the defendants' misconduct.

Accordingly, defendants' motion to dismiss claim one is denied.[8]

---

[8] Defendants also sought dismissal of claims two (for control person liability against Genzyme pursuant to Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1) and three (for control person liability against Termeer and Wyzga pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)) solely on the basis that claim one failed. The portion of the motion seeking dismissal of claims two and three is therefore denied.

II. State Law Claims

Plaintiffs assert violations of Massachusetts law in claims four through seven.

A. Securities Litigation Uniform Standards Act

Defendants argue that all of the state law claims asserted are prohibited by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1), which provides:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

SLUSA contains a savings clause, commonly referred to as the "Delaware carve-out," which preserves certain state law claims that would otherwise be prohibited. Under the savings clause a covered class action may be maintained if it is based upon the statutory or common law of the issuer's State of incorporation,[9] and <u>involves</u> (my emphasis) "the purchase or sale of securities by the issuer or an affiliate of the issuer

---

[9] Plaintiffs assert Massachusetts state law claims and Genzyme is incorporated is Massachusetts.

exclusively from or to holders of equity securities of the issuer." 15 U.S.C. § 78bb(f)(3)(A).

It states:

(i) Actions preserved

   Notwithstanding paragraph (1) or (2), a covered class action described in clause (ii) of this subparagraph that is based upon the statutory or common law of the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in a State or Federal court by a private party.

(ii) Permissible actions

   A covered class action is described in this clause if it involves—

   (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

   (II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that—

   (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

   (bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

15 U.S.C. § 78bb(f)(3)(A).

This raises the issue whether the Delaware carve-out applies to this case, in which most plaintiffs tendered their stock to the issuer in the Exchange transaction, but some sold their GZBX stock to buyers in the public market.

-11-

The defendants say those general market sales disqualify the claims from involving exclusively sales to the issuer, and thus deprive the plaintiffs of the Delaware carve-out. The plaintiffs say that the defendants' scheme involved, and centered on, the Exchange transaction which was only between Genzyme and its shareholders.

The question is whether the word "involves" should be construed broadly or narrowly. One can readily see that the exemption does not unambiguously apply textually; since there are open market transactions, the sales were not "exclusively" to the issuer.

Plaintiffs argue, however, that the actions by defendants which depressed the apparent value of their stock and reduced the proceeds of its sales were taken only in connection with the Exchange: their sole purpose was to affect the Exchange ratio, and their actions would not have been taken if it were not for the Exchange. Without the Exchange, the plaintiffs say, there would have been no scheme and the market would have proceeded normally. Thus, their claim in the action "involves" the Exchange and is exempted.

That construction finds some support in the balance of the exemption as enacted in SLUSA, and described in the Senate Report on SLUSA. It gives an alternate, or supplementary ground for preservation: that the action involves communications and

recommendations by the issuer concerning matters such as exchange offers, as well as the actual exchange itself.

The Senate Report explained the reasons for the exemptions as follows:

> The SEC, as well as other commentators, also noted the need to exempt from the legislation shareholder-initiated litigation based on breach of fiduciary duty of disclosure, in connection with certain corporate actions, that is found in the law of some states, most notably Delaware.
>
> The Committee is keenly aware of the importance of state corporate law, specifically those states that have laws that establish a fiduciary duty of disclosure. It is not the intent of the Committee in adopting this legislation to interfere with state law regarding the duties and performance of an issuer's directors or officers in connection with a purchase or sale of securities by the issuer or an affiliate from current shareholders or communicating with existing shareholders with respect to voting their shares, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

S. Rep. No. 105-182, at 6 (1998)(internal footnote omitted).

The majority of plaintiffs tendered their GZBX shares to Genzyme and their state law claims are textually preserved. The remaining plaintiffs sold their GZBX shares into the open market following the announcement by defendants that Genzyme was declaring an exchange and thus opted out of the Exchange. Nevertheless, these plaintiffs may be able to show that their state law claims stem from the existence and purpose of the Exchange or the defendants' communications, "duties and performance" in connection with the Exchange, and are thus

preserved. For the purposes of a motion to dismiss, drawing all inferences in favor of plaintiffs, the claims of all seller-plaintiffs are preserved from the SLUSA prohibition.[10]

B.  Breach of Fiduciary Duty

Count four alleges Termeer and the director defendants breached the fiduciary duties of loyalty, candor, good faith and due care. Relying primarily on Chokel v. Genzyme Corporation, No. 03-2520 BLS, 2003 Mass. Super. LEXIS 417 (Mass. Super. Ct. Nov. 12, 2003),[11] defendants argue that is not a viable claim because the Board's right to declare the Exchange stems from Genzyme's Articles of Organization and therefore invokes contract principles, not fiduciary principles.

The plaintiff in Chokel alleged that the defendants' timing of the Exchange while the GZBX share price was depressed was unfair. Finding that the Articles of Organization, a contract, defined the board's duties with respect to the timing of the Exchange, the court held that the breach of fiduciary duty claim was properly dismissed because "the stockholders' rights and

---

[10] With respect to their federal claim, the plaintiffs who sold into the market may have a different status concerning transaction causation, from those who tendered. This issue can be dealt with in connection with class certification.

[11] The portion of the Massachusetts District Court's opinion dismissing the breach of fiduciary duty claim was subsequently affirmed by a Massachusetts Appeals Court in Chokel v. Genzyme, No. 04-P-478, 2006 WL 625703 (Mass. App. Ct. March 14, 2006), leave to appeal granted, 848 N.E.2d 1211 (Mass. June 7, 2006). Defendants rely on the opinion by the Appeals Court in their April 4, 2006 Reply Memorandum of Law.

-14-

obligations for this particular transaction must be resolved by reference to the contract and its express and implied terms." Chokel v. Genzyme, No. 04-P-478, 2006 WL 625703, at *5 (Mass. App. Ct. March 14, 2006), leave to appeal granted, 848 N.E.2d 1211 (Mass. June 7, 2006).

Plaintiffs' claim here is premised on defendants' scheme to manage the Biosurgery Division's earnings and withhold positive news about the division in a coordinated effort to artificially depress the price of GZBX prior to exercising their rights under the Optional Exchange provision and carrying out the Exchange at the depressed price. They contest not only the timing of the Exchange, but also the manner in which defendants manipulated the GZBX stock price prior to the Exchange announcement. The allegations here invoke the parties' fiduciary relationship, as well as their contractual relationship, and plaintiffs have stated a claim for breach of fiduciary duty. See King v. Driscoll, 638 N.E.2d 488, 494 (Mass. 1994)(affirming finding that defendants conduct which led to the repurchase of plaintiff's stock, and not the terms of the repurchase agreement, breached the duties of utmost good faith and loyalty).

C.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege Genzyme breached the implied covenant of good faith and fair dealing under Genzyme's Articles (claim five) and the Merger Agreement (claim six).  Defendants seek dismissal of these claims, arguing that Genzyme strictly complied with the terms of the Optional Exchange provision. They maintain that they had the right to declare the Exchange at any time, that the Exchange ratio was calculated in accordance with the Fair Market Value formula and that plaintiffs cannot complain about the unfairness of the timing or the exchange ratio.

Although defendants adhered to the terms of the Optional Exchange provision, "conduct that conforms to the letter of the parties' agreement may still run afoul of its spirit." Chokel, 2006 WL 625703, at *4.  "The implied covenant of good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Anthony's Pier Four, Inc. v. HBC Associates, 583 N.E.2d 806, 820 (Mass. 1991)(quoting Drucker v. Roland Wm. Jutras Assocs., 348 N.E.2d 763 (Mass. 1976).  "[A] defendant may be found in breach of the implied covenant for manipulating contract rights as a means to extract more money, or pay less money, or to gain some other

unfair advantage beyond what the parties originally bargained for or reasonably expected." Chokel, 2006 WL 625703, at *4 (holding that plaintiff had stated a claim that defendants breached the implied covenant of good faith and fair dealing through the timing and implementation of the Exchange).

Knowing that the Exchange ratio would be based on the Fair Market Values of GZBX and GENZ, the Board allegedly managed corporate earnings and withheld positive information from the market with the intention of artificially depressing GZBX's share price, and then timed the Exchange to take advantage of the depressed price.

Plaintiffs have stated a claim for breach of the implied covenant of good faith and fair dealing.

D. Violation of Massachusetts General Law ch. 93A

Claim seven alleges Genzyme engaged in an unfair or deceptive act in the conduct of trade or commerce in violation of Mass. Gen. Laws ch. 93A. At least thirty days before filing suit alleging such a claim under Mass Gen. Law ch. 93A, plaintiff must send the prospective defendant "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." Id., § 9(3).

Defendants argue that this claim should be dismissed because plaintiffs did not send Genzyme a demand letter prior to filing the FAC as required by the statute. Plaintiffs concede that they did not send a demand letter, but argue that the statute does not specifically require a letter and that the four prior complaints in this action are sufficient to put defendants on "notice of the misconduct relied on." March 14, 2006 Plaint. Opp. Mem. at 46.

A written demand is a prerequisite to filing suit under Mass. Gen. Laws ch. 93A. See Entrialgo v. Twin City Dodge, Inc., 333 N.E.2d 202, 204 (Mass. 1975)("A demand letter listing the specific deceptive practices claimed is a prerequisite to suit and as a special element must be alleged and proved.").

The statute requires a demand before initiating litigation. It does not contemplate that a complaint may be served, and then pointed to as constituting a demand.

Claim seven is dismissed, without prejudice, for lack of a proper prior demand.

## CONCLUSION

The motion to dismiss claims one through six of the fourth amended complaint is denied. The motion to dismiss claim seven of the fourth amended complaint is granted without prejudice.

So ordered.

Dated: New York, New York
August 3, 2006

*Louis L. Stanton*
LOUIS L. STANTON
U.S.D.J.